IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

      Plaintiff,

vs.                                       Cr. No. 01-964 JP

ROMAN HERN MORAGA,

      Defendant.

MEMORANDUM OPINION AND ORDER

On September 28, 2001, the Defendant filed Defendant Roman Moraga's Motion to
Suppress Evidence Illegally Seized (Doc. No. 14). On May 21, 2002 I held a hearing on the
Defendant's motion to suppress. Assistant Federal Public Defenders Judith Rosenstein and
Richard Winterbottom were present at the hearing as was the Defendant. Also present at the
hearing was Scott Davidson, a brief writer for the Federal Public Defender's office. Assistant
United States Attorney James Tierney represented the United States of America and present with
him were FBI Special Agent Daniel Howington and ATF Special Agent Kent Masters. At the
conclusion of the hearing, I allowed counsel an opportunity to supplement their briefs based on
the evidence adduced at the suppression hearing. Having reviewed all of the briefs, the relevant
law, and the evidence, I find that the motion to suppress should be denied.

A. Background

      The Defendant asks the Court to suppress the evidence found as a result of the searches of
a 1978 Camaro and a 1993 Ford Taurus. The Defendant is charged with two counts of being a
felon in possession of a firearm (Counts I and V), two counts of being a felon in possession of
ammunition (Counts II and VI), one count of possession with intent to distribute 50 grams or

more of methamphetamine (Count III), and one count of carrying a firearm during and in relation to a drug trafficking crime (Count IV). The USA also seeks to forfeit $2,322.00 as proceeds from the controlled substance offense (Count VII).

1. The 1978 Camaro

On May 21, 2001, at approximately 1:48 a.m., Valencia County Sheriff's Deputy Joe Aaron Portillo received a dispatch call regarding gun shots being fired from a red vehicle with two persons in it. The shootings occurred in the El Cerro Mission area. The El Cerro Mission area is a dark, high crime area. Vehicles parked on the side of the street often are vandalized within an hour or two.

At 1:51 a.m., Valencia County Sheriff's Deputy Jeff Noah stopped a red Camaro in the El Cerro Mission area. The Camaro was parked on the shoulder of a public road possibly blocking a portion of a private driveway. The Defendant was the driver of the Camaro and Peggy Sisneros was a passenger. The Defendant and Ms. Sisneros were obviously intoxicated. Deputy Noah noticed a bottle of rum on the driver's seat. Deputy Noah asked the Defendant to step out of the car so that he could perform a field sobriety test. Deputy Portillo arrived at the stop while Deputy Noah was conducting the field sobriety test. By 2:00 a.m., Deputy Noah had arrested the Defendant and placed him in Deputy Noah's police unit. Upon seeing that Ms. Sisneros was in no condition to drive the Camaro and having just arrested the Defendant, Deputy Noah decided to have the Camaro towed. Deputy Noah then transported the Defendant to the Los Lunas Police Department.

Deputy Portillo, however, asked Ms. Sisneros if there was anyone who could retrieve the Camaro. Ms. Sisneros indicated that possibly her mother in Albuquerque could retrieve the

2

Camero but it would take her mother over an hour to do so. Deputy Portillo did not allow Ms.

Sisneros to call her mother to retrieve the Camero, because the Valencia County Sheriff's

Department did not have the manpower to wait with the vehicle until someone could retrieve it.

A tow truck would be able to tow the Camaro within ten to thirty minutes.

After Deputy Portillo locked Ms. Sisneros in his police unit and after Deputy Noah had

left with the Defendant, Deputy Portillo and Special Deputy Paul Sandoval conducted a

warrantless search of the Camaro. The search began at about 2:08 a.m. or 2:11 a.m. In just a few

minutes Deputies Portillo and Sandoval found, among other things, a loaded Smith and Wesson

.45 caliber handgun under the passenger seat with one round in the chamber and four in the

magazine. Deputy Portillo thought that the handgun could be easily handled by either the

passenger or the driver. The Camaro was subsequently impounded and towed. Deputy Portillo

indicated that the reason for impoundment was "for investigation" and the tow form only listed

items not tagged into evidence.

On May 29, 2001, Deputy Noah received a call from Agent Masters, who informed

Deputy Noah that a confidential informant reported that the Camaro had drugs hidden under the

hood. On May 30, 2001, the Valencia County District Attorney's Office and Detective John

Mallory told Deputy Noah that the evidence was insufficient to establish probable cause to obtain

a warrant to search under the hood of the Camaro. Deputy Noah nonetheless searched under the

hood of the Camaro and discovered methamphetamine. Deputy Noah felt that before the Camaro

could be released from the impound yard he needed to remove any drugs from the Camaro to

keep them off of the streets. Deputy Noah realized that the methamphetamine was illegally seized

and requested that the drugs be destroyed rather then held for evidence. Deputy Noah did not

intend to charge the Defendant with possession of the methamphetamine. In fact, the Defendant was not charged with possessing the methamphetamine.

2. The 1993 Ford Taurus

On June 20, 2001, members of the Fugitive Task Force, including New Mexico State Police Sergeant Ramon Casaus, set up a surveillance of Ms. Sisneros' residence at 516 Slate NE in Albuquerque. The Task Force had two outstanding federal warrants for the arrest of the Defendant and believed that the Defendant was at Ms. Sisnero's residence.

Around noon on June 20, 2001, Sgt. Casaus saw the Defendant leaving Ms. Sisnero's residence in a maroon Taurus. An Albuquerque Police Department patrol officer pulled in behind the Defendant on westbound Lomas Boulevard NW and engaged his emergency lights. The Defendant did not pull over and instead tried to avoid the police. Less than two minutes later, the Defendant was involved in an accident after heading down a one-way street in the wrong direction.[1] After the Taurus came to a stop, Sgt. Casaus and other law enforcement officials told the Defendant to get out of the car. The Defendant then ran from the Taurus for about a block and then turned into the parking garage at the Federal Courthouse. Sgt. Casaus pursued the Defendant on foot. Although Sgt. Casaus was in plain clothes, he had a vest and was wearing a badge. When the Defendant entered the parking garage, Sgt. Casaus shouted "Police!" and "Stop!" Sgt. Casaus had also drawn his weapon at this point. A marked police unit blocked the other end of the parking garage so the Defendant could not exit the parking garage without turning around. The police officer from the marked police unit drew his weapon on the Defendant. Sgt. Casaus and the police officer yelled at the Defendant to get on the ground. The

_____

[1]The Taurus was inoperable after the accident.

Defendant then surrendered to police officers. The pursuit on foot took approximately two minutes. Once the Defendant had surrendered, Sgt. Casaus noticed a gash on the Defendant's head and thought that the Defendant "looked out of it" or dazed.

The Defendant told rescue personnel that his name was Lawrence Garcia. The Defendant, in fact, had false identification indicating that his name was Lawrence Garcia. Sgt. Casaus informed the rescue personnel that the Defendant's name was actually Roman Moraga.

After having been photographed and sealed at the accident scene, the Taurus was towed that same day to Town and Country Towing. Agent Howington sealed the Taurus so that he could possibly obtain a search warrant for the Taurus. Law enforcement officials did not conduct an inventory search of the Taurus.

After the Defendant was arrested on June 20, 2001, he called Nora Baca to request her to ask Barry Smith, the registered owner of the Taurus, to take the Taurus out of the impound lot.[2] The Defendant released his personal possessions held at the jail to Ms. Sisneros. Those personal possessions included the title to the Taurus. The Defendant instructed Ms. Sisneros to give the title to Ms. Baca so she could get it to Mr. Smith. Mr. Smith stated that he was denied access to the Taurus at the impound lot because there was no car registered under his name. However, law enforcement officers had instructed the owner of Town and Country Towing not to release the Taurus until it was searched and released by law enforcement officials.

On June 25, 2001, at the request of Agent Tom Sparks, United States Air Force Sergeant Ricky Allen brought a drug detection dog to Town and Country Towing to inspect the Taurus.

---

[2]Although the Taurus was registered in Mr. Smith's name, the Defendant alleges that he bought the Taurus from Mr. Smith. The Defendant also alleges that Ms. Baca introduced him to Mr. Smith at the time he bought the Taurus from Mr. Smith.

Sgt. Allen had the permission of his superiors to conduct the canine inspection of the Taurus. Sgt. Allen's superiors told him that he was not allowed to seize evidence or to make contact with the suspect. Sgt. Allen testified at the suppression hearing that the military treats drug detection dogs like pieces of equipment. For instance, the dogs have stock numbers and the canine handler is considered an operator of the equipment.

Sgt. Allen's dog subsequently alerted to the front bumper of the Taurus. Sgt. Allen's entire participation in the investigation of the Taurus lasted less than five minutes. On June 26, 2001, the Taurus was searched pursuant to a search warrant. The search produced a loaded Smith and Wesson .357 caliber revolver with six rounds of .357 caliber ammunition, methamphetamine, and marijuana.

### 3. Ownership of the Vehicles

#### a. The Camaro

At the time of the Defendant's arrest on May 21, 2001, the Camaro was registered in the name of Attitude Automotive. Todd Vaporis does business as Attitude Automotive and held a first lien on the Camaro. Mr. Vaporis, however, had signed the back of the Camaro's Certificate of Title as a seller. The line for the buyer's name was left blank. Mr. Vaporis also signed a Bill of Sale for the Camaro which indicated a sale amount of $500.00. No buyer's name was indicated on the Bill of Sale.

The Defendant testified at the suppression hearing that he agreed to buy the Camaro from Mr. Vaporis for $2,500. The Defendant also testified that he had paid Mr. Vaporis only $2,000. According to the Defendant, Mr. Vaporis permitted him to take possession of the Camaro and gave him the Bill of Sale as well as the title to the Camaro. At the time of his arrest, the

Defendant had the Bill of Sale in the glove compartment of the Camaro and the title was in his pocket.

b. The Taurus

At the time the Defendant was arrested on June 20, 2001, the Taurus was registered to Barry Smith. Mr. Smith, however, had signed the back of the Taurus' Certificate of Title as a seller and dated it May 6, 2001. The Certificate of Title did not indicate who the buyer was. The Defendant testified at the suppression hearing that the purchase price for the Taurus was between $1,200 and $1,500. The Defendant stated he had paid part of the purchase price to Mr. Smith. The Defendant further testified that he had Mr. Smith's permission to drive the Taurus and that Mr. Smith gave him the title and registration for the Taurus. When the Defendant was arrested on June 20, 2001, he had both the title and registration of the Taurus with him.

Mr. Smith testified that he had told his neighbor Nora Baca that he wanted to sell the Taurus. Mr. Smith indicated that Ms. Baca arranged for a friend to buy the Taurus for a lump sum of $1,000. Mr. Smith testified that he was not sure to whom he sold the Taurus but he assumed the buyer was a male who accompanied Ms. Baca when the Taurus was sold. Although Mr. Smith did not identify the buyer as the Defendant, Mr. Smith described the Defendant as he might have appeared at the time the Taurus was purchased. Curiously, however, at the time of the purchase of the Taurus, Ms. Baca paid Mr. Smith the $1,000; Mr. Smith gave the title of the Taurus to Ms. Baca; and Ms. Baca drove the car away. Mr. Smith indicated that once he signed the Certificate of Title, he believed he relinquished ownership of the Taurus to the buyer. Mr. Smith stated that he left it up to the buyer to fill in the rest of the title transfer information.

The Defendant testified that he believed he was the owner of both the Camaro and the Taurus. He also believed that he had total control over both of the cars. The Defendant further testified that he did not register the cars in his name because he had not completely paid for the cars.

B. Discussion

The Defendant challenges the searches of both the Camaro and the Taurus. Regarding the Camaro, the Defendant argues that the initial search of the Camaro at the scene of the stop was an improper inventory search because it was not conducted in accordance with standard criteria and was really an investigative search. The Defendant also argues that the initial search of the Camaro was not incident to an arrest since the Defendant had already been removed form the scene of the stop before the search was conducted. Next, the Defendant argues that the impoundment of the Camaro violated the Fourth Amendment because the impoundment was neither supported by probable cause nor consistent with the caretaking role of police officers. Finally, the Defendant argues that a blanket suppression is appropriate with respect to all of the evidence seized from the Camaro because Deputy Noah's search under the hood nine days after the stop was in flagrant disregard of the Fourth Amendment.

With respect to the Taurus, the Defendant argues first that the continued seizure or impoundment of the Taurus for investigative purposes, without probable cause, violated the Fourth Amendment. Second, the Defendant argues that the warrant to search the Taurus was invalid, because when illegally obtained evidence is purged from the supporting affidavit, it fails to establish probable cause. Specifically, the Defendant contends that the use of an Air Force drug dog violated the Posse Comitatus Act, 18 U.S.C. §1385 and the judge who issued the warrant

should not have relied on information that the dog had detected drugs.

1. Standing to Contest the Searches of the Camaro and the Taurus

As an initial matter, the United States argues that the Defendant does not have standing to challenge the searches of the Camaro and the Taurus, because he was not the registered owner of those vehicles. "Fourth Amendment rights are personal and cannot be asserted vicariously." *United States v. Arango*, 912 F.2d 441, 445 (10th Cir. 1990), *cert. denied*, 499 U.S. 924 (1991)(citing *Rakas v. Illinois*, 439 U.S. 128, 140 (1978)). To determine if a defendant has a right to challenge a search, the Court must determine "whether the defendant manifested a subjective expectation of privacy in the area searched and whether society would recognize that expectation as objectively reasonable." *Id*. (citing *Smith v. Maryland*, 442 U.S. 735, 740 (1979)). To show standing to challenge a search of a vehicle, the defendant must produce sufficient credible evidence of lawful possession. *Arango*, 912 F.2d at 446 (citing *Rakas*, 439 U.S. at 130 n.1); *United States v. Cardenas*, 24 Fed. Appx. 890 (10th Cir. 2001), *cert. denied*, 122 S.Ct. 1579 (2002); *United States v. Erickson*, 732 F.2d 788 (10th Cir. l984). "Offering 'sufficient evidence' does not require that a defendant must present formal, documented proof of ownership or legitimate possession in order to have standing. *Arango*, 912 F.2d at 445. " *Cardenas*, 24 Fed. Appx at 892. The defendant "must at least state that he gained possession from the owner or someone with the authority to grant permission." *Arango*, 912 F.2d at 445. "Mere physical possession of the vehicle is not sufficient to confer standing." *United States v. Christian*, 43 F.3d 527, 530 (10th Cir. 1994).

### a. The Camaro

The Defendant testified that he was in the process of purchasing the Camaro from Todd Vaporis for $2,500. To support this testimony, the Defendant produced a Certificate of Title and Bill of Sale signed by Mr. Vaporis as the seller of the Camaro. The Defendant explained that he had not signed these documents because he still owed Mr. Vaporis $500. The Defendant also testified that Mr. Vaporis gave him permission to possess the Camaro. The Defendant's testimony concerning his alleged lawful possession of the Camaro is uncontradicted. Consequently, the Defendant had shown that he has a subjective expectation of privacy in the Camaro. He has also shown by credible and sufficient evidence that he had lawful possession of the Camaro. Accordingly, society would recognize the Defendant's expectation of privacy in the Camaro as objectively reasonable. The Defendant has standing to challenge the search of the Camaro.

### b. The Taurus

The Defendant had in his possession a Certificate of Title indicating that Barry Smith was the seller of the Taurus and he also had the vehicle's registration in Mr. Smith's name. These documents do not show that the Defendant was the owner of the Taurus. Although the Defendant stated at the suppression hearing that he believed he was in lawful possession of the Taurus because he was in the process of buying the Taurus from Mr. Smith for $1,200 or $1,500, the evidence does not support that statement. For instance, Mr. Smith contradicted various aspects of the Defendant's testimony about the Taurus. Mr. Smith testified he sold the Taurus for $1,000 cash which Nora Baca handed to him and that he gave the Certificate of Title and the car keys to Ms. Baca, who drove the car away. It is unclear from the testimony of Mr. Smith whether he

intended to sell the Taurus to the Defendant or to some other friend of Nora Baca. If Mr. Smith

sold the Taurus to another friend of Ms. Baca , there is no evidence that the Defendant had lawful

permission from that friend to use the Taurus. Under these circumstances, I cannot find that the

Defendant has carried his burden of demonstrating by credible and sufficient evidence that he had

an expectation of privacy in the Taurus which society would recognize as objectively reasonable.

The Defendant, therefore, does not have standing to challenge the impoundment and search of the

Taurus. I will, however, for the sake of argument, address the Defendant's contentions that the

Fourth Amendment was violated when the Taurus was impounded and searched.

    2. The Initial Search of the Camaro

        a. Search Incident to Arrest: Seizure of the Smith and Wesson .45 Caliber
        Handgun

The United States argues that the seizure of the Smith and Wesson .45 caliber handgun

was not made under an inventory search but was seized incidental to the arrest of the Defendant.

When a person is lawfully arrested, the police have the right to make, without a warrant, a

contemporaneous search of the area under the accused's immediate control. *Preston v. United*

*States*, 376 U.S. 364, 367 (1964). The area under the accused's immediate control includes "any

area 'generally reachable without exiting the vehicle, without regard to the likelihood in a

particular case that such a reaching was possible.'" *United States v. Olguin-Rivera*, 168 F.3d

1203, 1205 (10th Cir. 1999)(quoting *United States v. Doward*, 41 F.3d 789, 794 (1st Cir. 1994),

*cert. denied*, 514 U.S. 1074 (1995)). In other words, "when a police officer makes a lawful

custodial arrest of the occupant of a vehicle, the interior of that vehicle may be

contemporaneously searched." *United States v. Price*, 265 F.3d 1097, 1104 (10th Cir. 2001),

*cert. denied*, ___ S.Ct. ___, 2002 WL 242354 (citing *New York v. Belton*, 453 US. 454, 460 (1981)). "Once an accused is under arrest and in custody, then a search made at another place without a warrant, is simply not incident to the arrest." *Preston*, 376 U.S. at 367. *See also United States v. Lugo*, 978 F.2d 631, 635 (10th Cir. 1992)(once defendant was taken from the scene, there was no threat that he might reach in the vehicle and obtain a weapon or destroy evidence); *United States v. Bonitz*, 826 F.2d 954, 956 (10th Cir. 1987)(search after defendant was handcuffed and in custody was not conducted to disarm defendant, protect the safety of officers, or prevent destruction of evidence). The historical rationales for allowing a contemporaneous search incident to arrest are "(1) the need to disarm the suspect in order to take him into custody, and (2) the need to preserve evidence for later use at trial." *Knowles v. Iowa*, 525 U.S. 113, 116 (1998)(citing *United States v. Robinson*, 414 U.S. 218, 234 (1973)).

The Defendant argues that the search incident to arrest doctrine does not apply in this case because the search of the Camaro was conducted after he was on his way to the police station and after Ms. Sisneros was placed in a locked police unit. These facts demonstrate that "the rationale for a search incident to arrest had evaporated." *Lugo*, 978 F.2d at 635. Moreover, the search "was not contemporaneous because it was remote in time and in place" since the Defendant, Ms. Sisneros, and the Camaro were "in entirely different locations, and no exigency existed." *See id.* Accordingly, the search incident to arrest doctrine does not apply in this case.[3]

_____

[3]The Defendant also contends that he was intoxicated and would not have been able to grab the handgun or destroy evidence. There is no need to address this contention, since it was not further developed in the supplemental briefing and the Defendant persuasively argues that the search incident to arrest doctrine is inapplicable.

b.  Inevitable Discovery of the Smith and Wesson .45 Caliber Handgun

The United States also argues in the alternative that the Smith and Wesson .45 caliber handgun would have nonetheless been found during the inventory search of the Camaro.  "[I]f evidence seized unlawfully would have been inevitably discovered pursuant to a legal search, the evidence is admissible."  *United States v. Haro-Salcedo*, 107 F.3d 769, 773 (10th Cir. 1997)(citation omitted).  Furthermore, "the inevitable discovery exception applies whenever an independent investigation inevitably would have led to discovery of the evidence, whether or not the investigation was ongoing at the time of the illegal police conduct."  *United States v. Larson*, 127 F.3d 984, 986 (10th Cir. 1997), *cert. denied*, 522 U.S. 1140 (1998).  "The government has the burden of proving by a preponderance of the evidence that the evidence in question would have been discovered in the absence of the Fourth Amendment violation."  *United States v. Souza*, 223 F.3d 1197, 1203 (10th Cir. 2000).  For the inevitable discovery doctrine to apply to the Smith and Wesson .45 caliber handgun, the inventory search must have been a legally proper search. Before reaching the question of whether the inventory search was proper, the issue of whether the Camaro was properly seized or impounded must be addressed first.  *United States v. Andas-Gallardo*, 3 Fed. Appx. 959, 962 (10th Cir. 2001).

The Defendant argues that the Camaro was not properly impounded, thereby, violating the Fourth Amendment.  "An impoundment must either be supported by probable cause, or be consistent with the police role as 'caretaker' of the streets and completely unrelated to an ongoing criminal investigation."  *United States v. Duguay*, 93 F.3d 346, 352 (7th Cir. 1996)(citing *South Dakota v. Opperman*, 428 U.S. 364, 370 n.5 (1976)).  "The decision to impound an automobile, unless it is supported by probable cause of criminal activity, is only valid if the arrestee is

13

otherwise unable to provide for the speedy and efficient removal of the car from public thoroughfares or parking lots." *Id.* at 353. *See, e.g. Haro-Salcedo*, 107 F.3d at 771(reasonable to impound car when arrestee could not lawfully operate car); *United States v. Johnson*, 734 F.2d 503, 505 (10th Cir. 1984)(impoundment permissible when owner of car is intoxicated and impoundment is necessary to avoid vandalism); *United States v. Pappas*, 735 F.2d 1232, 1234 (10th Cir. 1984)(impoundment was not permissible when car was parked on private property and someone could have taken the car into safe custody). Here, the Defendant had been arrested and Ms. Sisneros was unable to drive the Camaro. In addition, the Camaro was parked on the public right of way and apparently was partially blocking a private driveway. The area where the Camaro was parked is a known high crime area where there is a history of vandalism of vehicles stopped alongside of the road. Although Deputy Portillo asked Ms. Sisneros whether anyone could retrieve the Camaro and Ms. Sisneros said her mother "possibly" could, a tow was nonetheless requested because even if Ms. Sisneros' mother had been able to get and drive the Camaro, it would have taken her an hour to arrive and the Valencia County Sheriff's Department lacked the manpower to have someone wait with the car for that length of time. The tow company, however, could reach the Camaro within ten to thirty minutes. These facts alone justify the impoundment of the Camaro based on the caretaking responsibilities of Deputies Portillo and Sandoval.

The Defendant argues, however, that Deputies Noah and Portillo could have done more to avoid the towing of the Camaro and still have fulfilled their caretaking responsibilities. In addition, the Defendant argues that Deputies Noah and Portillo wanted to tow the Camaro for investigative purposes as indicated by the towing form which stated that the Camaro was being

held "for investigation."  Considering the location of the Camaro and the length of time it would have taken for Ms. Sisnero's mother to retrieve the Camaro, even assuming she was available and could drive the car, I find that Deputies Noah and Portillo sufficiently performed their caretaking responsibilities by calling for a tow truck.  Moreover, the testimony adduced at the suppression hearing does not indicate that the request to hold the Camaro "for investigation" was made prior to Deputies Portillo and Sandoval finding the handgun and bottle of rum in the Camaro.  It is proper to hold a vehicle "for investigation" if there is probable cause to believe there is evidence of a crime in the vehicle.  *United States v. Cooper*, 949 F.2d 737, 747 (5th Cir. 1991), *cert. denied*, 504 U.S. 975 (1992).  *See also Capraro v. Bunt*, 44 F.3d 690, 691 (8th Cir. 1995).  In sum, I conclude that the Camaro was properly impounded.

Having found that the Camaro was properly seized or impounded, the next question in determining if the inevitable discovery doctrine applies is whether there was a proper inventory search of the Camaro.  An inventory search is permissible for three purposes:  "the protection of the owner's property while it remains in police custody ...; the protection of the police against claims or disputes over lost or stolen property, ...; and the protection of the police from potential danger."  *Opperman*, 428 U.S. at 369.  An inventory search is proper if the police followed a standardized procedure to conduct the search and the police did not act in bad faith or soley for the purpose of investigation.  *Colorado v. Bertine*, 479 U.S. 367, 372-73 (1987).  The standardized procedure, however, need not be written.  *United States v. Frank*, 864 F.2d 992, 1002 (3d Cir. 1988), *cert. denied*, 490 U.S. 1095 (1989).  In fact, "swift and effective action by an officer to secure a gun which he or she reasonably believes to be in an empty impounded car should be recognized as 'standard police procedure' for inventory search purposes as much as the

rote adherence to established written inventory procedures...." *United States v. Feldman*, 788 F.2d 544, 552 (9th Cir. 1986), *cert. denied*, 479 U.S. 1069 (1987). *See also Duguay*, 93 F.3d at 351 (a lack of a written policy is not dispositive and the Supreme Court in *Florida v. Wells*, 495 U.S. 1 (1990) suggests "that a well-honed department routine may be sufficient."). Even a deviation from standard procedures does not necessarily mean that the inventory search was unreasonable if there is no bad faith on the police's part and the search was not conducted solely to investigate. *United States v. Mayfield*, 161 F.3d 1143, 1145 (8th Cir. 1998), *cert. denied*, 526 U.S. 1045 (1999). In addition, "[t]he mere fact that an inventory search may also have had an investigatory purpose does not, however, invalidate it." *Frank*, 864 F.2d at 1001 (citing *United States v. Orozco*, 715 F.2d 158, 161 (5th Cir. 1983)). *See also United States v. Lumpkin*, 159 F.3d 983, 987 (6th Cir. 1998)("the fact that an officer suspects that contraband may be found does not defeat an otherwise proper inventory search."); *United States v. Lewis*, 3 F.3d 252, 254 (8th Cir. 1993), *cert. denied*, 511 U.S. 1111 (1994)("Having conducted the search of Lewis's van according to standardized inventory procedures, the officer's coexistent suspicions that incriminating evidence might be discovered did not invalidate their lawful inventory search."); *United States v. Marshall*, 986 F.2d 1171, 1175-76 (8th Cir. 1993)("The police are not precluded from conducting inventory searches when they lawfully impound the vehicle of an individual that they also happen to suspect is involved in illegal activity.").

The United States argues that the purpose of the inventory search of the Camaro was to protect the police from danger. This is a reasonable purpose when one considers that Deputy Noah was investigating shots fired from a vehicle. An inventory search is justified when a gun is involved and there is a need to look for other weapons and to keep guns away from untrained or

malicious persons.  *Johnson*, 734 F.2d at 505.

The Defendant argues, however, that the Valencia County Sheriff's Department cannot lawfully conduct an inventory search because they lack any written standards governing either inventories or impoundments.  As noted above, written standards are not necessary so long as there are standards.  Nonetheless, the Valencia County Sheriff's Office Administrative Manual provides that an inventory of items in a vehicle will be made when that vehicle is to be towed because ""[t]he driver has been incapacitated, hospitalized, arrested, [sic] when the vehicle cannot be released to a responsible party."  Rules 2-48-2(A) and 2-48-3(C).  That was the case here.  Deputies Portillo and Sandoval, therefore, followed a written standard criteria when they searched the Camaro.

The Defendant also argues that the deputies acted in bad faith in conducting the inventory search and intended to conduct an investigatory search.  The Defendant notes that the impoundment form states that the reason for impoundment of the Camaro was "for investigation." The evidence from the suppression hearing fails to show any bad faith on the parts of Deputies Portillo and Sandoval.  Even if Deputies Portillo and Sandoval suspected they would find a gun in the Camaro, there is no evidence that they initially searched the Camaro solely to investigate.  As indicated above, there is no evidence that Deputies Portillo and Sandoval wrote "for investigation" on the tow form as the reason for impoundment prior to the search of the Camaro. In sum, I find that the inventory search was proper.  Consequently, the handgun was properly seized under the inevitable discovery doctrine.

3.  The Second Search of the Camaro at the Impound Lot:  Blanket Suppression

The Defendant argues that a blanket suppression of the drugs found under the hood of the Camaro as well as the Smith and Wesson .45 caliber handgun found nine days earlier during the initial search of the Camaro is appropriate because the second search of the Camaro was in flagrant disregard of the Fourth Amendment.  The Defendant bases this argument on the allegations that Deputy Noah abused the impoundment process, violated the Valencia County Sheriff's Department inventory and impoundment procedures, did not have probable cause to search the engine compartment, and intentionally violated the Fourth Amendment.  The United States notes that it does not intend to use the drugs found under the hood of the Camaro as evidence at trial.

A blanket suppression of evidence including the suppression of properly seized evidence is appropriate when officers flagrantly disregard the terms of a search warrant.  *United States v. Medlin*, 842 F.2d 1194, 1199 (10th Cir. 1988).  "When law enforcement officers grossly exceed the scope of a search warrant in seizing the property, the particularity requirement is undermined and a valid warrant is transformed into a general warrant thereby requiring suppression of all evidence seized under that warrant."  *Id*.  In determining whether a blanket suppression is appropriate the court must focus on whether the "actual execution" of the warrant was in flagrant disregard of the terms of the warrant.  *United States v. Foster*, 100 F.3d 846, 851 (10th Cir. 1996).  The purpose of a blanket suppression is to prevent the "use of an otherwise valid warrant to conduct a general search."  *Id*.  Moreover, blanket suppression is authorized only in the "most 'extraordinary' of cases."  *Id*. at 852.

In this case there was no warrant to search the Camaro and, therefore, no concern that a valid search warrant would be turned into a general search warrant. The blanket suppression rule has been applied to both items seized during a particular search, as well as to the fruits of that search. Here, the handgun was seized in an earlier search separate from the search under the Camaro's hood. One could not characterize the handgun as a fruit of the search under the hood of the Camaro since the handgun had been seized prior to the seizure of the drugs from under the Camaro's hood. The facts surrounding Deputy Noah's search of the Camaro engine compartment are simply not extraordinary enough to justify a blanket suppression of evidence, especially evidence that had been lawfully seized more than a week earlier.

4. Continued Seizure of the Taurus

The Defendant argues that the continued impoundment of the Taurus was not for caretaking purposes but rather was for investigative purposes without probable cause. The Defendant bases this argument on the fact that the registered owner, Mr. Smith, was not allowed to take the Taurus from the impound lot. The United States argues that the Defendant abandoned any privacy interest he may have had in the Taurus when he fled from the car in attempting to avoid arrest. In addition, the United States contends that law enforcement officials had the right to seize the Taurus as evidence that the Defendant eluded police and caused a traffic accident.

"The test for abandonment is whether an individual has retained any reasonable expectation of privacy in the object." *United States v. Jones*, 707 F.2d 1169, 1172 (10th Cir.), *cert. denied*, 464 U.S. 859 (1983)(citations omitted). "This test of abandonment subsumes both a subjective and an objective component." *United States v. Garzon*, 119 F.3d 1446, 1449 (10th Cir. 1997). Findings of a subjective intent to abandon are findings of fact while "a determination

of whether the defendant retained an objectively reasonable expectation of privacy in the property that society will recognize is a question of law...." *Id*. The Tenth Circuit has found property to be abandoned "where the defendant either (1) explicitly disclaimed an interest in the object, or (2) unambiguously engaged in physical conduct that constituted abandonment." *Id*. at 1452. In a case similar to this one, the Fifth Circuit found that a defendant relinquished his privacy rights when, after a high-speed chase, he "abandoned his car ... on a public highway, with engine running, keys in the ignition, lights on, and fled on foot." *United States v. Edwards*, 441 F.2d 749, 751 (5th Cir. 1971). I find that the factual situation here likewise warrants a finding that upon fleeing from the Taurus the Defendant abandoned the Taurus and any privacy rights he might have had in the car. Law enforcement officials, therefore, had the right to seize and impound the Taurus.

Furthermore, "the police may seize a car from a public place without a warrant when they have probable cause to believe that the car itself is an instrument or evidence of crime." *United States v. Cooper*, 949 F.2d 737, 747 (5th Cir. 1991), *cert. denied*, 504 U.S. 975 (1992). *See also Capraro v. Bunt*, 44 F.3d 690, 691 (8th Cir. 1995). In this case, the Defendant used the Taurus to assist him in fleeing from the police and to cause a traffic accident. Law enforcement officials clearly had probable cause to seize the Taurus as "an instrument or evidence of crime." The seizure and impoundment of the Taurus was appropriate for this reason as well.

     5. The Canine Inspection of the Taurus

          a. The Posse Comitatus Act

The Defendant argues that the warrant to search the Taurus was invalid, because when illegally obtained evidence is purged from the supporting affidavit, the affidavit fails to establish

probable cause. Specifically, the Defendant contends that the use of an Air Force drug dog violated the Posse Comitatus Act (PCA), 18 U.S.C. §1385, and evidence derived from the dog's use must be stricken from the affidavit. The PCA states that "[w]hoever, except in cases and under circumstances expressly authorized by the Constitution or Act of Congress, willfully uses any part of the Army or the Air Force as a posse comitatus or otherwise to execute the laws shall be fined not more that $10,000 or imprisoned not more than two years, or both." 18 U.S.C. §1385. "[M]ilitary involvement, even when not expressly authorized by the Constitution or a statute, does not violate the Posse Comitatus Act unless it actually regulates, forbids, or compels some conduct on the part of those claiming relief." *Bissonette v. Haig*, 776 F.2d 1384, 1390 (8th Cir. 1985). "[T]he mere furnishing of materials and supplies cannot violate the [Posse Comitatus Act]" so long as there is no "active participation or direction" by the military. *Id. See also United States v. Bacon*, 851 F.2d 1312, 1314 (11th Cir. 1988)(the PCA is not violated where "the limited military participation was nothing more than a case of assistance to civilian law enforcement efforts by military personnel and resources."). In other words, the PCA is "violated when the military participation permeates or pervades the civilian investigation." *United States v. Torres*, 1993 WL 463413 *3 (D. Kan.)(citations omitted).

In this case, the Air Force provided only a resource to civilian law enforcement officers by allowing the dog to inspect the Taurus. The Air Force did not permeate or direct the civilian investigation. Neither did the Air Force compel the Defendant to do anything or forbid the Defendant from doing anything. Additionally, in a case similar to this one, the district court in Maryland found that

Congress authorized the Secretary of Defense to make available any military equipment and personnel necessary for the operation of said equipment to any law enforcement official for law enforcement purposes. 10 U.S.C. §§372, 374 (Supp. 1995). The Secretary of Defense has designated military dogs as 'equipment' and required military handlers to accompany the dogs as 'operators' of the equipment. ... Thus, the loan of trained dogs to law enforcement officers is sanctioned by Congress.

*United States v. Garcia*, 909 F.Supp. 334, 339 (D. Md. 1995), *aff'd by* 103 F.3d 121 (4th Cir. 1996). A federal statute authorizing the military's participation in civilian law enforcement investigations makes the PCA inapplicable by its own terms. The Defendant's PCA argument is without merit.

### b. Good Faith Reliance on Search Warrant

The United States argues that should the Court find that use of the Air Force dog violated the PCA and suppression would be appropriate, application of the exclusionary rule should be excused by the agent's "good faith" reliance on the search warrant. Evidence "need not be suppressed if the executing officer acted with an objective good-faith belief that the warrant was properly issued by neutral magistrate." *United States v. Danhauer*, 229 F.3d 1002, 1006 (10th Cir. 2000) (citing *United States v. Leon*, 468 U.S. 897, 922 (1984)). "When reviewing the reasonableness of an officer's reliance upon a search warrant, this court must examine the underlying documents to determine whether they are 'devoid of factual support.'" *Id*. at 1006-07 (citing *United States v. McKneely*, 6 F.3d 1447, 1454 (10th Cir. 1993)). "The Supreme Court recognizes four situations in which an officer would not have reasonable grounds for believing a warrant was properly issued." *Id*. at 1007 (citing *Leon*, 468 U.S. at 922-23). Those situations are when 1) "the issuing magistrate was misled by an affidavit containing false information or information that the affiant would have known was false if not for his 'reckless disregard of the

truth;'" 2) "the 'issuing magistrate wholly abandon[s her] judicial role;'" 3) "the affidavit in support of the warrant is 'so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable;'" and 4) "a warrant is so facially deficient that the executing officer could not reasonably believe it was valid." *Id.* (quoting *Leon*, 468 U.S. at 923).

The Defendant argues that his counsel, Ms. Rosenstein, spoke with agents before they searched the Taurus and questioned their authority to search the car. Consequently, the Defendant argues that the officers did not have a reasonable ground for believing that the search warrant was properly issued. Additionally, the Defendant argues that the officers should have known that their use of a military drug dog was in contravention of the PCA. These two arguments simply do not demonstrate a lack of objective good faith on the part of the agents in executing the search warrant. I find that the agents executing the warrant acted in good faith and that the good faith doctrine justifies the search of the Taurus, even if use of the military dog had been improper.

IT IS ORDERED that Defendant Roman Moraga's Motion to Suppress Evidence Illegally Seized (Doc. No. 14) is denied.


_____
CHIEF UNITED STATES DISTRICT JUDGE